UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

JOAQUIM MEDEIROS,

CASE NO.: 1:26-CV-27916

Plaintiff,

v.

RIMKUS CONSULTING GROUP, INC.,

Defendant.
_______________________________________/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Joaquim "Jo" Medeiros, ("Plaintiff" or "Mr. Medeiros"), by and through undersigned counsel, sues Defendant, RIMKUS CONSULTING GROUP, INC. ("Rimkus" or the "Company"), and in support thereof, states:

**NATURE OF THE ACTION**

1. This is an action for damages brought by Plaintiff against Rimkus arising from unlawful discrimination based on age, retaliation for engaging in protected whistleblower activity, interference with and retaliation for the exercise of rights under the Family and Medical Leave Act, and retaliation for pursuing workers' compensation benefits, all culminating in the termination of Plaintiff's nineteen-year career with Rimkus.

2. Plaintiff seeks compensatory damages, back pay, front pay, liquidated damages, punitive damages, equitable relief, attorney's fees, and costs pursuant to the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq. ("ADEA"); the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01 et seq. ("FCRA"); the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"); the Florida Private Whistleblower Act, Fla. Stat. § 448.101 et seq. ("FWA"); and Florida's workers' compensation retaliation statute, Fla. Stat. § 440.205.

**JURISDICTION AND VENUE**

3. This Court has original subject matter jurisdiction over Plaintiff's claims arising under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq.; and the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq., pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 626(c)(1), and 29 U.S.C. § 2617(a)(2), and has supplemental jurisdiction over Plaintiff's related state law claims arising under the Florida Civil Rights Act of 1992, Fla. Stat. § 760.01 et seq.; the Florida Private Whistleblower Act, Fla. Stat. § 448.101 et seq.; and Fla. Stat. § 440.205, pursuant to 28 U.S.C. § 1367(a), because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because the unlawful employment practices alleged herein were committed in this District, because Defendant Rimkus resides in this District within the meaning of 28 U.S.C. § 1391(c)(2), and because a substantial part of the acts and omissions giving rise to this action occurred within this District, in Miami-Dade County, Florida, including acts and decisions made and coordinated through Rimkus's Miami office, and/or because Rimkus maintains an office and regularly conducts business within this District. Plaintiff's claims accrued in Miami-Dade County, and this action is therefore properly brought in the Miami Division of this Court.

5. This Court has personal jurisdiction over Defendant Rimkus pursuant to Fla. Stat. § 48.193, as incorporated by Fed. R. Civ. P. 4(k)(1)(A), because Rimkus operates, conducts, engages in, and carries on business within the State of Florida, including within this District, and the causes of action alleged herein arise directly from that business activity.

## PARTIES

6. Plaintiff, Joaquim Medeiros, is an individual over the age of eighteen, sui juris, and at all times relevant hereto was a resident of Broward County, Florida.

7. Defendant, Rimkus is a corporation authorized to transact business in the State of Florida which, at all times relevant hereto, employed Plaintiff and employed fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year, and is therefore an "employer" within the meaning of the ADEA, 29 U.S.C. § 630(b); the FCRA, Fla. Stat. § 760.02(7); and the FMLA, 29 U.S.C. § 2611(4).

8. Luke Sharara ("Sharara"), who is not a party to this action, was, at all times relevant hereto, employed by Rimkus as Vice President of the East Region, which encompassed Plaintiff's employment, and acted, directly or indirectly, in the interest of Rimkus with respect to Plaintiff, including by exercising authority over Plaintiff's work assignments, discipline, leave, performance evaluations, and termination, and at all times relevant hereto acted as Rimkus's agent within the course and scope of his employment.

9. Roberto Rada Prada ("Rada Prada"), who is not a party to this action, was, at all times relevant hereto, employed by Rimkus as Miami District Manager, with direct supervisory authority over Plaintiff, and acted, directly or indirectly, in the interest of Rimkus with respect to Plaintiff, including by exercising authority over Plaintiff's work assignments, discipline, leave, performance evaluations, and termination, and at all times relevant hereto acted as Rimkus's agent within the course and scope of his employment.

## CONDITIONS PRECEDENT / ADMINISTRATIVE EXHAUSTION

10. Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), Charge No. 510-2026-09796, alleging discrimination on the basis of national origin and age, and retaliation, against Rimkus.

11. The EEOC issued Plaintiff a Notice of Right to Sue with respect to that Charge on or about June 25, 2026.

12. This action is filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue, as that period was extended by the written Tolling Agreement described below.

13. On September 23, 2026, within the ninety-day period following Plaintiff's receipt of the Notice of Right to Sue, Plaintiff and the respondents named therein, including Rimkus, entered into a written Tolling Agreement under which all statutes of limitations, charge-filing periods, and other time-based limitations applicable to Plaintiff's claims were tolled from September 23, 2026 through the end of the Tolling Period defined therein, and the respondents agreed not to assert the passage of time during the Tolling Period in any defense.

14. Plaintiff has exhausted all administrative remedies and satisfied all conditions precedent to the filing of this action, or such conditions have been waived, excused, or satisfied.

**GENERAL FACTUAL ALLEGATIONS**

15. Mr. Medeiros is a civil and structural engineer, a licensed Professional Engineer (P.E.) with an M.Eng. degree, and a native of Brazil.

16. Prior to joining Rimkus, Mr. Medeiros worked for approximately four years at another forensic consulting firm, MKA International, and previously worked for approximately eighteen years at Petrobras, a Brazilian national petroleum company.

17. Mr. Medeiros joined Rimkus in 2007 and worked there continuously for approximately nineteen years, through his termination on January 7, 2026.

18. Throughout his tenure, Mr. Medeiros was one of Rimkus's top-producing engineers and expert witnesses, consistently meeting or exceeding the Company's billable efficiency targets and earning, through the period preceding the retaliation described herein, in excess of $250,000 annually in total compensation.

19. Mr. Medeiros received formal recognition from Rimkus for over a decade of excellence in investigations and customer service.

20. Rada Prada became Mr. Medeiros's District Manager beginning approximately 2016-2017.

21. As District Manager, Rada Prada assumed responsibility for setting matter budgets and conducting technical/peer reviews of Mr. Medeiros's work.

22. Under Rimkus's workflow, the District Manager set the budget for each matter before assigning it to an engineer; the engineer inspected the property and wrote the report; a second engineer performed a technical review; Rimkus's internal formatting group ("CPC") formatted the report; and the engineer signed and sealed the report for delivery to the client. Because Rada Prada set the budgets on Mr. Medeiros's matters, he was able to log his own time to those matters within budgets he himself had set, where it drew no scrutiny at invoicing.

23. In or around 2020, Mr. Medeiros noticed in his time records a two-hour entry on a matter for which he had already released the final report. When Mr. Medeiros raised the entry with Rada Prada, Rada Prada offered no explanation other than that it reflected a "new policy" instructed by then-Vice President Lasure.

24. In or around 2022, Mr. Medeiros noticed, through his own review of his billing and time records, that Rada Prada had billed time to a client matter after Mr. Medeiros had already completed and delivered the final report on that matter. Mr. Medeiros brought this directly to Rada Prada's attention. Rada Prada represented to Mr. Medeiros that the entry was an error.

25. Separately, upon information and belief, in or around 2022, a District Manager in Rimkus's Fort Lauderdale office, Drew Hains, independently identified irregularities in Rada Prada's billing practices prior to an invoice being released, cut Rada Prada's improperly billed

time, and brought the matter to the attention of Rimkus's Vice President, providing Rimkus with additional, independent notice of Rada Prada's fraudulent billing practices. Following Mr. Hains' report, Rimkus's Vice President informed Mr. Medeiros that Rada Prada was "under observation" and was not to engage in that conduct again. Rimkus' management therefore knew of Rada Prada's improper billing no later than 2022. The improper entries continued and Rimkus nonetheless continued to delegate Rada Prada with authority over budgets and invoices, and ratified and adopted the unlawful billing practice by retaining the illicit revenue in Rimkus's corporate accounts, refusing to notify or refund the affected clients, and directing only that future entries be concealed or removed from Mr. Medeiros's view while leaving Rada Prada in supervisory authority throughout Mr. Medeiros's tenure.

26. Despite this notice, from both Mr. Medeiros and Mr. Hains, Rimkus took no meaningful corrective or disciplinary action against Rada Prada and permitted him to remain in a position of direct supervisory authority over Mr. Medeiros.

27. In or around 2022, Rada Prada began telling Mr. Medeiros that Mr. Medeiros was "making too much money," stating that Mr. Medeiros was earning approximately a quarter of a million dollars a year.

28. During that same time period, and notwithstanding Rada Prada's representation that the 2022 billing entry was an isolated "error," Mr. Medeiros continued to notice recurring irregularities in Rada Prada's billing on his matters in the period that followed, including instances in which Rada Prada falsely billed time to Mr. Medeiros's matters by claiming he had performed technical reviews that he had not actually performed, and billed separately for both "technical review" and "report preparation" on the same reports.

29. Rada Prada "parked" time on matters by entering time entries that counted toward his billable-hour requirement, then writing those entries off before invoices were sent to the client.

30. Rada Prada billed for activities he did not perform in order to meet his billable requirements, causing clients to be charged for work that was never done and misrepresenting what he was doing on the matters.

31. Rada Prada also logged time to Mr. Medeiros's matters that was written off before invoicing. Those write-offs spared the client the charge but still credited Rada Prada with billable hours toward his billable-hour requirement. Rimkus was aware of this practice and took no action to stop it.

32. Those false billing entries later appeared in Rimkus's records in summer of 2024 during a deposition and made it appear as though Mr. Medeiros had testified falsely when he stated that Rada Prada had performed no work on the file. In reality, Mr. Medeiros's testimony was truthful; the inaccuracy was created by Rada Prada's false billing entries, which misrepresented work performed in order to increase charges to Rimkus' clients and was utilized to attempt to impeach Mr. Medeiros' testimony at trial which further upset the client. The file at issue was a property insurance claim matter for one of Rimkus's insurance-carrier clients, on which Mr. Medeiros alone inspected the property and authored the signed and sealed report. Rada Prada nonetheless billed time to that matter for work on the report that he did not perform. Upon information and belief, Rimkus invoiced that time to its client and collected payment on it.

33. That exposure prompted Mr. Medeiros to review the billing on his own matters. His review revealed that Rada Prada's conduct was not an isolated error but a scheme affecting multiple clients across multiple matters: Rada Prada had billed for "preparing" reports that Mr. Medeiros alone had written, billed separately for technical review of the same reports, posted time

to files after the reports had been finalized and delivered, and directed recurring nominal entries to keep files open.

34. Rada Prada's fraudulent billing scheme resulted in improper charges to numerous Rimkus clients and related third-party payors whose files and accounts Mr. Medeiros worked on or is aware were affected, including, without limitation, the following entities: Citizens Property Insurance Corporation; Safety Specialty Insurance Company; American Coastal Insurance Company; Universal Property & Casualty Insurance Company; Certain Underwriters at Lloyd's; Ameritrust Group, Inc.; State Farm Insurance Company; St. Johns Insurance Company; Southern Oak Insurance Company; Florida Insurance Guaranty Association, Inc.; Centauri Insurance Company; United Property & Casualty Insurance Company; National General Insurance Company; Ironshore Insurance Services, Inc.; National Fire & Marine Insurance Company; Independent Specialty Insurance Company; Tapco Insurance Company; Vault Insurance; Allstate Insurance Company; Peninsula Insurance Company; Safepoint Insurance Company; Canopius US Insurance Company; Peninsula Insurance Bureau; Ark Royal Insurance Company; Assurant Insurance Company; Liberty Mutual Insurance Company; Old Republic Insurance Company; Avatar Property Insurance Company; Endurance American Specialty Insurance Company; ICAT Managers, Ltd.; Assurant Specialty Property Insurance Company; American Strategic Insurance Corporation; National Specialty Insurance Company; Bass Underwriters, Inc.; AIG Property Claims Field Group; Farmers Insurance Company; Auto Club Insurance Company of Florida; Great Lakes Insurance SE; James River Insurance Company; Proctor Financial Insurance Company; Heritage Property & Casualty Insurance Company; United Specialty Insurance Company; Century Surety Group; Nautilus Insurance Company; Ategrity Specialty Insurance Company; GeoVera Specialty Insurance Services; Kin Interinsurance Network; Gulfstream

Insurance Company; Olympus Insurance Company; People's Trust Insurance Company; Hudson Insurance Company; Florida Insurance Alliance; Enstar Group; American Guaranty Fund Group, Inc.; AmeriTrust Insurance Company; Hamilton Insurance Group; Milber Makris Plousadis & Seiden, LLP; Roig Lawyers; Law Offices of Robert D. Tetreault; Sedgwick Claims Management Services, Inc.; Specialty Claims Management; Bronstein & Carmona, P.A.; Wheeler DeFusco & Associates; Johns Eastern Company, Inc.; Bazinsky, Korman & Baker, P.A.; Luks, Santaniello, Petrillo & Cohen; Behar & Behar; Rolfes Henry Co. LPA; and Raphael & Associates.

35. Upon review of multiple files affecting the aforementioned clients, Mr. Medeiros realized that Rada Prada's billing irregularities were not simply a one-off error, but part of a recurring pattern of fraud and he reported the conduct directly to Rimkus management beyond Rada Prada himself – and this time in writing.

36. Mr. Medeiros's email marked a turning point. Until then, Rada Prada's entries had been characterized as isolated mistakes, to be corrected quietly. Mr. Medeiros' email identified them, in writing, as a recurring pattern of billing for work not performed, and created a written record that Rimkus's management had been told so. Rimkus was displeased that Mr. Medeiros had put the matter in writing. Each adverse action described below followed that email: the reduction of his caseload, the April 2025 advisory, the two negative evaluations in 2025, the June 27, 2025 written warning, and, after his further written report of October 8, 2025, his termination.

37. It was at this point, once Mr. Medeiros began formally reporting Rada Prada's billing fraud to Rimkus management, that Rada Prada began a sustained pattern of retaliation against Mr. Medeiros, including systematically reducing Mr. Medeiros's assigned caseload; first by Rada Prada beginning in 2024, and continuing into 2025, from approximately twenty (20)

matters per month to as few as four (4), while diverting work to newly hired, substantially younger engineers.

38. Mr. Medeiros's formal, written reports to Sharara detailed that Rada Prada had billing entries on Mr. Medeiros's matters despite not being the assigned technical reviewer, and that Rada Prada had instructed Mr. Medeiros and a scheduling assistant to bill nominal time (approximately 0.2 hours every two to three weeks) on matters solely to keep client files artificially open. Mr. Medeiros objected to participating in that practice, including in writing on July 19, 2025.

39. On October 8, 2025, Mr. Medeiros again reported Rada Prada's fraudulent billing to Sharara in writing, identifying that Rada Prada had billing entries on Mr. Medeiros' matters although Rada Prada was not the assigned technical reviewer on those matters. Rimkus terminated Mr. Medeiros's employment ninety-one (91) days later. The entries he identified included time for work Rada Prada did not perform on matters whose reports had already been finalized and delivered to Rimkus's clients. Upon information and belief, Rimkus invoiced those entries to, and was paid by, its insurance-carrier and law-firm clients.

40. Mr. Medeiros repeatedly raised concerns, in writing and in person, to Rada Prada and Sharara regarding the reduction in his caseload but Rimkus failed to take corrective action and instead Mr. Medeiros' case load was reduced.

41. Because Rada Prada was starving Mr. Medeiros's South Florida caseload, Mr. Medeiros sought and obtained matter assignments from Rimkus's Tampa and Orlando offices beginning in 2024, following Hurricanes Helene and Milton, in order to sustain his billable hours.

42. In late 2025, while attempting to sustain his caseload through assignments in the Orlando area, Mr. Medeiros performed a roof inspection that required him to climb a three-story ladder alone.

43. While ascending the ladder, he injured himself and developed a hernia. Because the injury caused acute abdominal pain, Mr. Medeiros was unable to complete the inspection, and the assignment was completed by use of a drone. Mr. Medeiros called the Orlando District Manager from the site to arrange for a drone operator to complete the inspection. Rimkus therefore knew of the incident on the day it occurred, and knew that Mr. Medeiros could not complete a Rimkus inspection because of acute abdominal pain.

44. In April 2025, shortly before Mr. Medeiros was scheduled to begin a two-week vacation, Rada Prada convened a Teams meeting with Fort Lauderdale District Manager Drew Hains and Rimkus Marketing Manager Tom McConnell under the guise of addressing purported client complaints. During the meeting, Mr. Medeiros was given advisory discipline based on vague and unspecified allegations regarding his performance. When Mr. Medeiros presented multiple emails from clients praising his work; Rada Prada disregarded the favorable feedback and proceeded with the advisory. The circumstances and timing of the meeting, coupled with the refusal to consider evidence contradicting the alleged complaints, demonstrated that the advisory was not a legitimate performance-related measure but rather a pretextual attempt to create a disciplinary record against Mr. Medeiros.

45. In May 2025, while Mr. Medeiros was on vacation abroad, Rada Prada was unable to locate the signed report on Rimkus's server, due to a clerical omission by Rimkus's internal formatting department and not any failure by Mr. Medeiros.

46. Without conducting a reasonable investigation or consulting the internal departments responsible for report processing and formatting to attempt to locate the document, Rada Prada represented to Sharara that Mr. Medeiros had failed in his responsibilities and that Mr. Medeiros had been irresponsible and caused an unsigned "draft" version of the report to be

delivered to the client in place of the signed version. The incident reflected an effort to manufacture a record of purported performance deficiencies against Mr. Medeiros rather than a good-faith attempt to determine the true cause of the issue.

47. Rada Prada did not attempt to contact Mr. Medeiros directly regarding this issue, despite having Mr. Medeiros's personal cell phone number and a history of contacting him directly, including internationally, on prior occasions.

48. Upon Mr. Medeiros's return from vacation, and before he had resumed working, Rada Prada convened a call lasting more than one hour to deliver formal discipline to Mr. Medeiros accusing him of failing to timely sign and deliver the report described above. During that call, Mr. Medeiros located the signed report on his own hard drive and confirmed, through Rimkus's own internal formatting department, that the report had in fact been properly delivered to the client more than four weeks earlier. Rada Prada never formally corrected the record with Sharara or apologized to Mr. Medeiros.

49. On June 27, 2025, Rada Prada issued Mr. Medeiros a written Performance Improvement Plan/warning that cited, among other things, Mr. Medeiros's efforts to seek additional work assignments; assignments Rada Prada himself had been withholding as a performance deficiency.

50. Mr. Medeiros received two negative performance evaluations within a single calendar year (March and June of 2025) – following years of evaluations rating him as "exceeding expectations."

51. This all followed Rada Prada's remark that Mr. Medeiros was "making too much money," and Mr. Medeiros's ratings declined from "exceeds expectations" to "meets expectations" in 2024 and to "inconsistent performance" in 2025.

52. Mr. Medeiros repeatedly requested reassignment to a different supervisor and repeatedly complained, in writing, to Rimkus management, including Sharara, regarding the retaliatory reduction of his caseload after reporting Rada Prada's fraudulent billing practices. Rimkus denied each request for reassignment, including Mr. Medeiros's requests to return to the Fort Lauderdale office under Mr. Hains. On July 19, 2025, Mr. Medeiros wrote to Mr. Hains renewing his request, first made a month earlier, to return to the Fort Lauderdale office because he no longer trusted Rada Prada. In the same email, Mr. Medeiros objected in writing to Rada Prada's billing practices; objected to Rada Prada's instruction to bill 0.2 hours every two to three weeks to keep files open; calculated from Rada Prada's own time records that approximately 238 matters carried such entries; and reported that he had confronted Rada Prada about the entries on July 14, 2025.

53. During 2025, Vice President Sharara separately approached Mr. Medeiros about entering semi-retirement, in his words, as some of Mr. Medeiros's older colleagues had done. Mr. Medeiros expressed his intention and ability to continue working for many more years and stated he would seek supplemental part-time work elsewhere rather than reduce his hours with Rimkus

54. Upon information and belief, during the same period, Rimkus pushed out two other older engineers, one of whom was forced into retirement and the other of whom resigned under pressure after raising concerns. The reduction of Mr. Medeiros's caseload served the same end: to make his position unsustainable so that he would request semi-retirement himself.

55. On August 26, 2025, Mr. Medeiros emailed Rimkus's Chief Operating Officer expressing his intention and desire to continue working for Rimkus for approximately four to eight additional years and requesting additional work assignments. In the same email, Mr. Medeiros informed the Chief Operating Officer that his assignments had fallen from approximately twenty

(20) matters per month to four (4). The Chief Operating Officer directed him to work with Rada Prada and Sharara to obtain more assignments. Shortly thereafter, Rimkus assigned Mr. Medeiros four additional matters, one of which fell outside his engineering discipline.

56. Mr. Medeiros's abdominal pain from the 2025 ladder incident described above was later diagnosed as a hernia, discovered in connection with an emergency room visit in October 2025 for gastrointestinal bleeding, ultimately requiring surgical repair.

57. Mr. Medeiros timely notified Rimkus of his serious health condition, including by informing Rimkus in November 2025 that he could not carry heavy loads because of the hernia, and also about his pending hernia repair surgery which was performed on December 11, 2025.

58. Despite being notified that Mr. Medeiros had sustained a work-related injury and despite his reporting the injury to Rimkus, the Company failed to properly initiate or process a workers' compensation claim. Instead, when Mr. Medeiros required leave to undergo surgery and recover from a serious health condition arising from that injury, Rimkus classified his absence as paid time off ("PTO") rather than designating it as protected leave under the Family and Medical Leave Act ("FMLA").

59. Rimkus did so despite possessing sufficient information to know that Mr. Medeiros' leave was necessitated by a serious health condition requiring surgery and qualifying medical treatment. By treating the leave as ordinary PTO rather than workers' compensation leave and/or FMLA-protected leave, Rimkus failed to afford Mr. Medeiros the protections to which he was entitled and further contributed to the Company's efforts to characterize legitimate, medically necessary absences as attendance or performance-related issues.

60. Mr. Medeiros's treating physician cleared him to return to work on January 11, 2026. Mr. Medeiros provided Rimkus with written medical documentation of that clearance and affirmatively asked Rimkus to begin assigning him work in anticipation of his return.

61. On December 30, 2025, while still on medical leave and in physical pain, Mr. Medeiros made himself available to meet with Sharara, who informed Mr. Medeiros that he was being considered for layoff for purportedly failing to retain clients, notwithstanding that certain attorneys had expressly requested that only Mr. Medeiros handle their matters.

62. On January 7, 2026, only four days before Mr. Medeiros was medically cleared to return to work, Rimkus terminated his employment, claiming that the decision was part of a company-wide reduction in force. That explanation was pretextual.

63. Rimkus's stated selection criteria for the purported reduction in force were subjective and, upon information and belief, were applied on the basis of the advisory, evaluations, and written warning that Rada Prada and Sharara generated after Mr. Medeiros began reporting Rada Prada's billing practices. To the extent the termination decision was formally made by others within Rimkus, it was made on information supplied and shaped by Rada Prada and Sharara, each of whom bore retaliatory and discriminatory animus toward Mr. Medeiros.

64. At or around the time of Mr. Medeiros' termination, Rimkus had hired two individuals under the age of 40 and reassigned Mr. Medeiros' work and client matters to those employees, demonstrating that his position and duties continued to exist despite the purported reduction in force.

65. Contrary to Rimkus' characterization of Mr. Medeiros' termination as a nondiscretionary, business-driven reduction in force, Rimkus was, during the same period, actively

recruiting and hiring new, substantially younger engineers and diverting work previously performed by Mr. Medeiros to them.

66. Mr. Medeiros was the oldest member of his team, at seventy years of age, and was replaced by engineers under the age of forty, at least one in his early thirties.

67. On April 28, 2026, after Mr. Medeiros's termination, Rimkus's Senior Counsel, J.D. Hess, contacted Mr. Medeiros regarding a potential investigation into the billing practices Mr. Medeiros had raised, confirming that Rimkus was aware of Mr. Medeiros's reports. Despite this fact, Rimkus took no disciplinary action against Rada Prada while Mr. Medeiros remained employed and did not contact Mr. Medeiros about the billing until after it had terminated him.

68. As a direct and proximate result of Rimkus's conduct described herein, Mr. Medeiros has suffered economic damages, including past and future lost wages and benefits; physical and medical harm, including a cardiac event requiring emergency treatment and stent placement, temporary optic nerve palsy, gastric ulcers, gastrointestinal bleeding, and hernia repair surgery; and emotional and dignitary harm, including anxiety, insomnia, and emotional distress.

69. As a result of the foregoing, Mr. Medeiros retained the undersigned counsel, Chin Law, P.A., to represent him in connection with the claims asserted herein, and has agreed to pay Chin Law, P.A. a reasonable fee for its services.

## COUNT I
## AGE DISCRIMINATION IN VIOLATION OF THE ADEA
## (Against Defendant Rimkus)

70. Plaintiff realleges and incorporates by reference paragraphs 1 through 69 above as if fully set forth herein.

71. Rimkus is an "employer" within the meaning of the ADEA, 29 U.S.C. § 630(b).

72. At all times relevant hereto, Mr. Medeiros was at least forty (40) years of age and was, in fact, approximately seventy (70) years old, placing him within the class protected by the ADEA.

73. Mr. Medeiros was qualified for his position and performed his job satisfactorily.

74. Rimkus subjected Mr. Medeiros to adverse employment actions, culminating in his termination, while replacing him with substantially younger engineers under the age of forty.

75. Rimkus's stated reasons for terminating Mr. Medeiros as part of a purported reduction in force are pretextual, as Rimkus was simultaneously hiring younger engineers and diverting Mr. Medeiros's work to them.

76. Rimkus management, through Rada Prada, remarked to Mr. Medeiros that he was "making too much money," and thereafter subjected him to declining performance evaluations, evidencing discriminatory animus based on age.

77. During 2025, Sharara urged Mr. Medeiros, then approximately seventy years of age, to enter semi-retirement, as other older colleagues had done. After Mr. Medeiros declined, Rimkus continued to reduce his caseload, terminated his employment, and diverted his work to engineers under the age of forty.

78. Rimkus's age discrimination against Mr. Medeiros was willful within the meaning of the ADEA, 29 U.S.C. § 626(b).

79. As a direct and proximate result of Rimkus's unlawful discrimination, Mr. Medeiros has suffered and continues to suffer damages, including past and future lost wages and benefits.

WHEREFORE, Plaintiff, Joaquim Medeiros, respectfully demands judgment against Defendant Rimkus for back pay, front pay, liquidated damages equal to the amount of back pay

pursuant to 29 U.S.C. § 626(b), attorney's fees and costs pursuant to 29 U.S.C. § 626(b), pre- and post-judgment interest, and such other and further relief as this Court deems just and proper.

**COUNT II**
**AGE DISCRIMINATION IN VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT**
**(Against Defendant Rimkus)**

80. Plaintiff realleges and incorporates by reference paragraphs 1 through 69 above as if fully set forth herein.

81. Rimkus is an "employer" within the meaning of the FCRA, Fla. Stat. § 760.02(7).

82. At all times relevant hereto, Mr. Medeiros was approximately seventy (70) years of age, placing him within the class protected by the FCRA.

83. Rimkus subjected Mr. Medeiros to adverse employment actions, culminating in his termination, motivated in whole or in part by his age, while replacing him with substantially younger engineers.

84. Sharara's urging that Mr. Medeiros enter semi-retirement, described in paragraph 53 above, and the diversion of Mr. Medeiros's work to engineers under the age of forty evidence that Mr. Medeiros's age motivated Rimkus's conduct.

85. Rimkus's stated reasons for Mr. Medeiros's termination are pretextual.

86. As a direct and proximate result of Rimkus's unlawful discrimination, Mr. Medeiros has suffered and continues to suffer damages, including past and future lost wages and benefits, and emotional pain and suffering.

87. Rimkus's conduct was undertaken with malice or with reckless indifference to Mr. Medeiros's state-protected rights, entitling Plaintiff to punitive damages under Fla. Stat. § 760.11.

WHEREFORE, Plaintiff, Joaquim Medeiros, respectfully demands judgment against Defendant Rimkus for back pay, front pay, compensatory damages, punitive damages, attorney's

fees and costs pursuant to Fla. Stat. § 760.11(5), pre- and post-judgment interest, and such other and further relief as this Court deems just and proper.

**COUNT III**
**RETALIATION IN VIOLATION OF THE FLORIDA PRIVATE WHISTLEBLOWER ACT, FLA. STAT. § 448.102**
**(Against Defendant Rimkus)**

88. Plaintiff realleges and incorporates by reference paragraphs 1 through 69 above as if fully set forth herein.

89. Rimkus is an "employer" within the meaning of the FWA, Fla. Stat. § 448.101(3).

90. Mr. Medeiros engaged in statutorily protected activity under Fla. Stat. § 448.102(3) by disclosing to, and objecting and refusing to participate in, Rimkus's violation of law, rule, or regulation, namely, Rada Prada's fraudulent billing scheme directed at Rimkus's clients, including regulated insurance carriers, which Mr. Medeiros reported internally to Rimkus management, including Sharara, on multiple occasions. Mr. Medeiros's protected objections include his written objections of July 19, 2025 and October 8, 2025.

91. Rada Prada's billing of Rimkus's clients for work he did not perform, through Rimkus's invoicing system and for Rimkus's financial benefit, was an activity, policy, or practice of Rimkus, carried out by its District Manager in the course and scope of his employment. Rimkus adopted and continued that practice by retaining the payments collected on those entries, by declining to notify or reimburse the affected clients, and, upon Mr. Medeiros's written objection, by directing only that entries be removed from Mr. Medeiros's matters. Rimkus's management had notice of the practice no later than 2022, when Mr. Hains reported it to the Vice President, and Rimkus continued to invoice its clients and collect payment while Rada Prada remained in his position. Upon information and belief, Rimkus did not audit Rada Prada's prior billings, did not

refund or credit the affected clients, and did not notify them that their files contained entries for work never performed.

92. That activity, policy, or practice is in violation of law, including the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(a), which prohibits engaging in a systematic, ongoing course of conduct with intent to obtain property by false or fraudulent pretenses or representations and obtaining property thereby, and Florida's theft statute, Fla. Stat. § 812.014. Upon information and belief, Rimkus transmitted the invoices containing those entries to its clients by interstate electronic mail and wire from or through its headquarters in Houston, Texas. Rimkus's activity, policy, or practice also violates the statutes and rules governing the practice of professional engineering in Florida, including Chapter 471, Florida Statutes, and the rules of the Florida Board of Professional Engineers adopted thereunder, which prohibit fraud and deceit in the practice of engineering.

93. Rimkus was aware of Mr. Medeiros's protected disclosures and objected to his having made them in writing.

94. Following and because of Mr. Medeiros's protected disclosures, Rimkus subjected him to adverse employment actions, including systematic reduction of his caseload, issuance of pretextual negative performance evaluations and a written warning, and ultimately termination of his employment.

95. A causal connection exists between Mr. Medeiros's protected disclosures and the adverse employment actions taken against him, as reflected by the escalating pattern and close temporal proximity between his complaints and Rimkus's retaliatory conduct. Rimkus terminated Mr. Medeiros's employment ninety-one (91) days after his written report of October 8, 2025. On December 30, 2025, eighty-three (83) days after Mr. Medeiros's October 8, 2025 written report

and while he was on surgical leave, Sharara informed him that he was being considered for layoff, and Rimkus terminated him before he returned from that leave. Mr. Medeiros's selection for the purported reduction in force rested on the advisory, evaluations, and written warning.

96. As a direct and proximate result of Rimkus's unlawful retaliation, Mr. Medeiros has suffered and continues to suffer damages, including past and future lost wages and benefits, and emotional pain and suffering.

WHEREFORE, Plaintiff, Joaquim Medeiros, respectfully demands judgment against Defendant Rimkus for back pay, front pay, compensatory damages, and reasonable attorney's fees and costs pursuant to Fla. Stat. § 448.104, pre- and post-judgment interest, and such other and further relief as this Court deems just and proper.

**COUNT IV**
**INTERFERENCE IN VIOLATION OF THE FMLA, 29 U.S.C. § 2615(a)(1)**
**(Against Defendant Rimkus)**

97. Plaintiff realleges and incorporates by reference paragraphs 1 through 69 above as if fully set forth herein.

98. Rimkus is an "employer" within the meaning of the FMLA, 29 U.S.C. § 2611(4).

99. Mr. Medeiros was an "eligible employee" within the meaning of the FMLA, 29 U.S.C. § 2611(2), having been employed by Rimkus for more than twelve months and for more than 1,250 hours during the twelve months preceding his leave.

100. Mr. Medeiros suffered from a "serious health condition" within the meaning of the FMLA, 29 U.S.C. § 2611(11), namely a hernia requiring surgical repair, together with related gastrointestinal complications, and was entitled to FMLA-protected leave for treatment of that condition.

101. Mr. Medeiros provided Rimkus with timely and adequate notice of his need for leave. Mr. Medeiros informed Rimkus in November 2025 that he could not carry heavy loads because of his hernia, and notified Rimkus in advance of his December 11, 2025 surgery.

102. Rimkus failed to designate Mr. Medeiros's leave as FMLA leave, instead classifying it as ordinary paid time off, and thereby failed to afford Mr. Medeiros the notices, protections, and job restoration rights to which he was entitled under the FMLA.

103. Rimkus terminated Mr. Medeiros's employment four days before his medically authorized return-to-work date, thereby denying him the benefit to which he was entitled under the FMLA of reinstatement to his position, or an equivalent position, following his qualifying leave.

104. As a direct and proximate result of Rimkus's interference with Mr. Medeiros's FMLA rights, Mr. Medeiros has suffered and continues to suffer damages, including past and future lost wages and benefits.

WHEREFORE, Plaintiff, Joaquim Medeiros, respectfully demands judgment against Defendant Rimkus for lost wages and benefits, liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), equitable relief, attorney's fees and costs pursuant to 29 U.S.C. § 2617(a)(3), pre- and post-judgment interest, and such other and further relief as this Court deems just and proper.

**COUNT V**
**RETALIATION IN VIOLATION OF THE FMLA, 29 U.S.C. § 2615(a)(2)**
**(Against Defendant Rimkus)**

105. Plaintiff realleges and incorporates by reference paragraphs 1 through 69 above as if fully set forth herein.

106. Mr. Medeiros exercised, and attempted to exercise, rights protected under the FMLA by notifying Rimkus of his need for leave to undergo hernia repair surgery and by taking such leave.

107. Rimkus was aware of Mr. Medeiros's exercise of FMLA-protected rights.

108. Rimkus terminated Mr. Medeiros's employment four days before his medically authorized return-to-work date, under the pretextual guise of a reduction in force.

109. A causal connection exists between Mr. Medeiros's exercise of FMLA-protected rights and his termination, as reflected by the close temporal proximity between his leave and his termination.

110. Rimkus's stated reasons for terminating Mr. Medeiros are pretextual.

111. As a direct and proximate result of Rimkus's unlawful retaliation, Mr. Medeiros has suffered and continues to suffer damages, including past and future lost wages and benefits.

WHEREFORE, Plaintiff, Joaquim Medeiros, respectfully demands judgment against Defendant Rimkus for lost wages and benefits, liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), equitable relief, attorney's fees and costs pursuant to 29 U.S.C. § 2617(a)(3), pre- and post-judgment interest, and such other and further relief as this Court deems just and proper.

**COUNT VI**
**WORKERS' COMPENSATION RETALIATION IN VIOLATION OF FLA. STAT. § 440.205**
**(Against Defendant Rimkus)**

112. Plaintiff realleges and incorporates by reference paragraphs 1 through 69 above as if fully set forth herein.

113. Mr. Medeiros sustained a workplace injury, a hernia, arising out of and in the course of a Rimkus field inspection in 2025 that required him to ascend a three-story ladder alone, and

thereafter made a good-faith attempt to obtain medical treatment and benefits for that injury, including surgical repair.

114. Rimkus knew of Mr. Medeiros's injury on the day it occurred, when Mr. Medeiros called the Orlando District Manager from the site because he could not complete the inspection, and again in November 2025, when Mr. Medeiros informed Rimkus that he could not carry heavy loads because of the hernia and advised Rimkus of his upcoming surgery.

115. Mr. Medeiros's pursuit of medical treatment and benefits for his workplace injury constitutes protected activity under Fla. Stat. § 440.205, which prohibits an employer from discharging an employee "by reason of such employee's valid claim for compensation or attempt to claim compensation."

116. Rimkus terminated Mr. Medeiros's employment on January 7, 2026, four days before his scheduled return from surgical leave for that workplace injury.

117. The temporal proximity between Mr. Medeiros's workplace injury, his pursuit of treatment, and his termination, together with the pretextual nature of Rimkus's stated reduction-in-force rationale and the broader pattern of retaliatory conduct described herein, establishes that Rimkus terminated Mr. Medeiros by reason of his workplace injury and his attempt to obtain compensation and benefits therefor, in violation of Fla. Stat. § 440.205.

118. As a direct and proximate result of Rimkus's unlawful retaliation, Mr. Medeiros has suffered and continues to suffer damages, including past and future lost wages and benefits, and emotional pain and suffering.

119. Rimkus's conduct was willful, wanton, and in reckless disregard of Mr. Medeiros's statutorily protected rights, entitling Plaintiff to punitive damages, which are not subject to a statutory cap under Florida law where fraud or intentional misconduct is at issue.

WHEREFORE, Plaintiff, Joaquim Medeiros, respectfully demands judgment against Defendant Rimkus for back pay, front pay, compensatory damages, punitive damages, pre- and post-judgment interest, costs, and such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, Joaquim Medeiros, hereby demands a trial by jury on all issues so triable as a matter of right.

Respectfully submitted,

**CHIN LAW**
*Attorney for Joaquim Medeiros*
33 SW 2nd Avenue, Suite 1100
Miami, Florida 33130
Tel.: (786) 505-1225

*By: /s/ Katherine A. Chin, Esq.*
Katherine A. Chin
kc@legalchin.com
FBN: 1004417